UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKLIN EWC, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC., et al.,<br><br>Defendants. | Case No. 20-cv-04434 JSC<br><br>**ORDER RE: MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 10 & 11 |

COVID-19 has wreaked economic havoc on American small businesses. This insurance coverage dispute arises out of that havoc; in particular, Plaintiffs allege that Defendants must cover their economic losses suffered as a result of government business closure orders issued to stem the spread of the virus.[1] Defendants move to dismiss on the grounds that Plaintiffs' insurance policy provides no coverage for these economic losses as matter of law. (Dkt. Nos. 10, 11.)[2] After considering the insurance policy's language, the parties' written submissions, and having had the benefit of oral argument on September 3, 2020, the Court concludes that, drawing all inferences from the complaint's allegations in Plaintiffs' favor, the policy's virus exclusion bars coverage of Plaintiffs' financial losses.

**BACKGROUND**

Franklin EWC, Inc. ("Franklin EWC") is a California corporation that owns and operates the European Wax Center, Fresno location ("EWC Fresno"). (Dkt. No. 1 at 12 ("Complaint")

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 8 & 12.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generate page numbers placed at the top of the documents.

¶ 20.)[3]  Plaintiff Kathy Franklin is the sole owner and operator of Franklin EWC.  (*Id.*)  EWC Fresno is a waxing salon in the European Wax Center franchise, and is one of the most profitable European Wax Centers in California.  (*Id.* ¶ 2.)  EWC Fresno employed over 30 employees.  (*Id.*)  Franklin EWC insured EWC Fresno with the "Spectrum Business Owner's Policy No. 21 SBA RS4714" (the "Policy"), entered into with defendant Sentinel Insurance Company, Ltd. ("Sentinel").  (*Id.* ¶ 3; Dkt. No. 11 at 11.)  The Policy provides various forms of business interruption coverage, and Plaintiffs regularly paid the Policy's monthly premiums.  (Complaint ¶ 3.)  The Policy ran from June 8, 2019, to June 8, 2020.  (*Id.* ¶ 13.)

On March 19, 2020, EWC Fresno was forced to close due to the State of California's Executive Order N-33-20 and other public health orders (the "Closure Orders") that required all non-essential businesses to immediately close due to the COVID-19 pandemic.  (*Id.* ¶¶ 1, 6.)  EWC Fresno's customers were unable to patronize the salon and, as a result, Plaintiffs have suffered business losses and laid off approximately 30 employees.  (*Id.*)  On or after March 19, 2020, Franklin EWC filed a claim with Sentinel requesting coverage under the Policy for business income lost due to the Closure Orders.  (*Id.* ¶ 56.)  On April 8, 2020, Plaintiffs were notified that their claim was denied.  (*Id.* ¶ 57.)  This lawsuit against Sentinel and Hartford Financial Services Group ("HFSG") followed.

**DISCUSSION**

**I.  Sentinel's Motion to Dismiss**

The Policy's Special Property Coverage Form provides that the insurer "will pay for direct physical loss of or physical damage to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss."  (Dkt. No. 10-1 at 31.)[4]  A "Covered Cause of Loss" is defined as a "RISK[] OF DIRECT PHYSICAL LOSS" unless the loss is excluded by the Policy's

---

[3] The complaint begins at Page 12 of Dkt. No. 1.
[4] The Court may consider the Policy's content under the incorporation by reference doctrine.  *Biltmore Assocs., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 665 n.1 (9th Cir. 2009) ("A court may consider documents, such as the insurance policies, that are incorporated by reference into the complaint.")

2

1  "Exclusions" section.  (*Id.* at 32.)  The complaint alleges that the proliferation of the coronavirus

2  caused "direct physical damage and loss" triggering coverage under the Policy.  (Complaint ¶ 7

3  (emphasis removed).)  Indeed, the complaint highlights the "**physical damage to property**

4  **caused by the virus**" and that "**the virus physically is causing property loss or damage.**"  (*Id.*

5  (emphasis in original) (citing Orders of Napa and Sonoma County Health Officers).)

### A. The Virus Exclusion

Sentinel moves to dismiss on the grounds that the Policy excludes from its coverage any loss caused directly or indirectly by a virus.  In particular, the Virus Exclusion provision provides that the Special Property Coverage Form exclusions include the following:

> **i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**
>
> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> **(1)** Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.

(Dkt. No. 10-1 at 127.)

Sentinel has met its burden of proving that the Virus Exclusion applies to Plaintiffs' allegations of coverage.  *See State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 321 (9th Cir. 1989) ("[T]he insurer bears the burden of proving . . . the applicability of an exclusion[.]") (citation omitted).  The complaint repeatedly alleges that the virus caused and continues to cause the risk of direct physical loss required for a Covered Cause of Loss.  (Complaint ¶¶ 7, 12, 44, 54).  Thus, as the loss was caused directly or indirectly by the virus, the Virus Exclusion applies under its plain and unambiguous language.  *See, e.g.*, *Waller v. Truck Ins. Exch., Inc*., 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995) ("The clear and explicit meaning of the

3

[policy] provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage [] controls judicial interpretation.") (internal quotations and citations omitted); *Roug v. Ohio Sec. Ins. Co.*, 182 Cal. App. 3d 1030, 1035 (1986) ("An insurance policy is but a contract, and, like all other contracts it must be construed from the language used; when the terms are plain and unambiguous, it is the duty of courts to enforce the agreement.") (internal quotations and citations omitted); Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

### B. Civil Authority Coverage

Plaintiffs do not dispute in their complaint or their written opposition to the motion to dismiss that losses caused directly or indirectly by COVID-19 are excluded from Policy coverage. Instead, they contend that there is coverage under the Policy's "Civil Authority Coverage" provision ("Civil Authority Provision") notwithstanding the Virus Exclusion. It states:

> **q. Civil Authority**
>
> **(1)** This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

(Dkt. No. 10-1 at 41.) Plaintiffs argue that the provision applies because they lost business income, and because the Closure Orders prohibited access to their property "as a direct result of a Covered Cause of Loss." The Covered Cause of Loss, they insist, is the Closure Orders that created the "RISK[] OF DIRECT PHYSICAL LOSS" separate and independent from the virus. Thus, under Plaintiffs' theory, the loss is created by the Closure Orders rather than the virus, and therefore the Virus Exclusion does not apply. Nonsense.

4

1       The plain language of the Civil Authority Provision provides that it applies when access is prohibited by order of the civil authority "***as the direct result of*** a Covered Cause of Loss." (emphasis added). Under Plaintiffs' theory, the Closure Orders (the orders of a civil authority) were issued as the direct result of the Closure Orders, a claimed Covered Cause of Loss. However, the Closure Orders cannot have been issued as a result of the Closure Orders; instead, as the complaint repeatedly alleges, they were issued as the direct result of COVID-19—a cause of loss that falls squarely within the Virus Exclusion. *See Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305, at *6 (W.D. Tex. Aug. 13, 2020) (holding that an insurance policy's Virus Exclusion barred plaintiffs' recovery for losses incurred during the COVID-19 pandemic where "[p]laintiffs [] pleaded that COVID-19 [was] in fact the reason for [county and state shutdown orders] being issued" and that, while the "[o]rders technically forced [plaintiffs' properties] to close to protect public health, the [o]rders only came about sequentially *as a result* of the COVID-19 virus spreading . . . . [t]hus, it was the presence of COVID-19 . . . that was the *primary root cause* of [p]laintiffs' [losses].") (emphasis added).

      Further, the Civil Authority Provision does not create coverage, it "extends" coverage when the civil authority orders are issued "as the direct result of a Covered Cause of Loss to property in the immediate area" of the insured's property. There is nothing in the complaint that supports an inference that the Closure Orders were issued as a direct result of the Closure Orders (Plaintiffs' theory of the Covered Cause of Loss) and that the Closure Orders *themselves* caused damage to neighboring property. Plaintiffs' theory for recovery under the Civil Authority Provision fails.

      Plaintiffs' reliance on a "concurrent cause" analysis does not save their coverage theory. They contend that so long as a non-excluded risk (here, the Closure Orders) is the "efficient proximate cause" of their Covered Cause of Loss that there is coverage under the Policy. At least two problems with this argument immediately stand out. First, as explained above, the complaint repeatedly alleges that the virus caused the risk of direct physical injury—therefore the virus is the excluded risk that would otherwise trigger a Covered Cause of Loss. (Complaint ¶¶ 7, 12, 44, 54.) Second, under the plain language of the Civil Authority Provision, the order of a civil authority

5

must be caused by and therefore separate from the Covered Cause of Loss. At bottom, the Closure Orders cannot possibly be the same as the Covered Cause of Loss.

Plaintiffs' emphasis on the "all risks" nature of the Policy is unpersuasive. Plaintiffs never explain how, in light of the Civil Authority Provision's plain language, a reasonable policyholder can or should consider that the Closure Orders were the direct result of the Closure Orders (rather than COVID-19) *even if* the Court adopts Plaintiffs' reading of the "Covered Cause of Loss" provision as an "all risk" or "all perils" policy. *See AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990) ("[Courts] generally interpret the coverage clauses of insurance policies broadly, protecting the *objectively reasonable expectations* of the insured.") (emphasis added).

At oral argument Plaintiffs declined to defend the coverage theory set forth in their written opposition. They instead proposed an entirely new theory as to why the Virus Exclusion does not apply: Defendants had not shown that the loss was caused by the "[p]resence, growth, proliferation, spread, or any activity of . . . virus" as required by the Virus Exclusion. (Dkt. No. 10-1 at 127.) Putting aside that this argument is flatly contradicted by the complaint's allegation that "the Coronavirus was proliferating onto virtually every surface and object in, on, and around commercial premises such as that belonging to EWC Fresno, and thereby causing direct physical damage" (Complaint ¶ 7(emphasis removed)), the Court will not consider an argument Plaintiffs did not raise in their written opposition. *See Liang v. Nguyen*, No. CV 08-8211PSG (JCx), 2009 WL 514073, at *2 (C.D. Cal. Feb. 26, 2009) (declining to consider arguments defendants later raised but did not raise in an opposition to a motion for preliminary injunction despite having "adequate opportunity" to do so because "those arguments should have been raised in [d]efendants' opposition . . . . [t]he failure to do so divests [defendants] of the opportunity to do so now.").

The complaint unambiguously alleges that any Covered Cause of Loss was directly or indirectly caused by COVID-19. Defendants have therefore met their burden of proving that the Virus Exclusion applies.

//

//

### C. Limited Virus Provision

Plaintiffs argue in the alternative that, even if the Virus Exclusion bars their claims, they are entitled to coverage under the Policy's Limited Virus exception to the Virus Exclusion. The Policy provides "LIMITED FUNGI, BACTERIA, OR VIRUS COVERAGE" up to $50,000 that applies only where a virus is the result of one or more "specified cause of loss" elsewhere defined as: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." (Dkt. No. 10-1 at 55, 128).

Plaintiffs have not met their burden of showing that the business losses are covered under the Policy's Limited Virus provision. Plaintiffs have not alleged that the virus was caused by any of the specified causes of loss; instead, they contend that the Limited Virus provision imposes an "absurd coverage requirement that is factually impossible to satisfy" whose enforcement would be "unconscionable, void as against public policy, and inequitable." (Complaint ¶¶ 83, 106-107; Dkt. No. 14 at 17). However, the complaint does not include any allegations that support an inference of factual impossibility. Further, while Plaintiffs cite California Civil Code § 1638 for the proposition that a contract's clear language governs so long as it "does not involve an absurdity," Plaintiffs do not specify what policy language is allegedly absurd. Moreover, "an insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." *Nat'l Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 386 (1976) (internal quotations and citation omitted). In light of the complaint's pleading deficiencies and opposition's unfocused arguments, Plaintiffs have failed to meet their burden in showing that the business losses are covered under the Policy's Limited Virus exception to the Virus Exclusion.

\* \* \*

Plaintiffs' contract-based claims for breach of contract, breach of covenant of good faith and fair dealing, bad faith denial of an insurance claim, unjust enrichment and declaratory relief are dismissed. Drawing all reasonable inferences from the complaint's allegations in Plaintiffs' favor, *see Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012), the Virus

1    Exclusion applies as a matter of law.  The unjust enrichment claim fails for the additional reason
2    that an action in quasi-contract does not lie "when an enforceable, binding agreement exists
3    defining the rights of the parties."  *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d
4    1151, 1167 (9th Cir. 1996).  Plaintiffs' UCL claims are likewise predicated on the Policy, and are
5    therefore likewise dismissed.  In light of Plaintiffs' other claims, the complaint's claim for
6    injunctive relief must be dismissed with prejudice.  *See Rhynes v. Stryker Corp.*, No. 10-5619 SC,
7    2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Where the claims pleaded by a plaintiff *may*
8    entitle her to an adequate remedy at law, equitable relief is unavailable.") (citation omitted)
9    (original emphasis).

### D.    The Fraud-Based Claims

Because Plaintiffs' fraudulent misrepresentation claim as currently pleaded is based on allegations regarding the "implied and express fraudulent misrepresentations contained in the Policy," (Dkt. No. 14 at 21), this claim is dismissed in light of the Policy's plain language.  While Plaintiffs allege that Sentinel also made "affirmative[] misrepresentations" regarding the Policy's coverage, it is unclear when, where, or how this occurred, and therefore this fails the heightened pleading standards required for fraud claims.  *See Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Similarly, regarding Plaintiffs' constructive fraud claims, Plaintiffs have pleaded that Defendants owed fiduciary and quasi-fiduciary duties to Plaintiffs, "including duties of loyalty, due care, good faith, and fair dealing in connections with their actions under the Policy." (Complaint ¶ 98.)  However, because Sentinel complied with the Policy, absent any additional allegations regarding Sentinel's actions beyond the non-specific "affirmative[] misrepresentations" this claim must be dismissed as well.

## II.    HFSG's Motion to Dismiss

The claims against HFSG fail for the same reasons as those against Sentinel.  HFSG also argues that Plaintiffs lack Article III standing as to HFSG, the Court lacks general and specific personal jurisdiction over it, and that the complaint is otherwise deficient under Rule 12(b)(6).  For the sake of completeness, and because an analysis of the plaintiffs' standing usually comes first, the Court will address whether Plaintiffs have pleaded facts sufficient to meet their burden of

showing Article III standing, but need not and does not address HFSG's other arguments.

Article III standing consists of three "irreducible constitutional minimum" requirements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (May 24, 2016) (citations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To be "particularized," an injury "must affect the plaintiff in a personal and individual way," while "concreteness" requires an injury to be "de facto; that is, it must actually exist." *Id.* (internal quotations and citations omitted). Where a plaintiff lacks Article III standing, the suit must be dismissed under Rule 12(b)(1). *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

HFSG argues that Plaintiffs have not alleged facts showing that it engaged in conduct that caused Plaintiffs any injury in fact because, unlike Sentinel, HFSG did not have a contract with Plaintiffs. Further, HFSG offers evidence that it was not involved with Plaintiffs' contract or claims in any way, including, "but not limited to, their investigation, handling, or denial." (Dkt. No. 11-3 ("Janeiro Declaration") ¶¶ 6-8.)[5]

Plaintiffs do not dispute their lack of a contract with HFSG; instead, they identify complaint allegations that describe the conduct of both Defendants on the theory that, because Defendants acted in concert with one another or entered into some kind of agency or alter-ego relationship, their joint conduct is applicable to HFSG to illustrate injury in fact. (Complaint ¶¶ 27-28.) These conclusory, boilerplate allegations do not demonstrate they have suffered any injury that is fairly traceable to HFSG, nor have they alleged any specific harm attributable to HFSG because HFSG was never a party to the Policy on which Plaintiffs' claims are based. *See,*

---

[5] Unlike a Rule 12(b)(6) motion, on a Rule 12(b)(1) motion the Court may consider affidavits or other evidence. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*

9

*e.g.*, *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576 (1973) ("Obviously, the non-insurer defendants were not parties to the agreements for insurance; therefore, they are not . . . subject to an implied duty of good faith and fair dealing.").

Plaintiffs respond that the Policy's language references "The Hartford" throughout, and states in an introductory notice: "THANK YOU FOR RENEWING YOUR POLICY WITH THE HARTFORD . . . . IF AT ANY TIME YOU NEED COPIES OF ANY OF THE FORMS LISTED ON YOUR POLICY, PLEASE CALL YOUR HARTFORD AGENT OR BROKER." (Dkt. No. 11-1 at 3.) The Policy also bears the same logo as HFSG's Form 10-K that states the logo is "one of the most recognized symbols in the financial services industry." (Dkt. No. 11-4 at 7.) Plaintiffs' essential argument is that, in light of the Form 10-K's information, the presence of "The Hartford" throughout the Policy demonstrates the Policy was drafted, sold, and serviced by HFSG and that, therefore, Plaintiffs have met their burden of establishing Article III standing with regard to their claims against HFSG.

Plaintiffs' theory is belied by the Form 10-K's language. "The Hartford" is a defined term and trade name that refers to HFSG *and* its subsidiaries. (Dkt. No. 11-4 at 7.) The Form 10-K continues: "[HFSG] is *separate and distinct* from its subsidiaries and has no significant business operations of its own." (*Id.* (emphasis added).) The Form 10-K's plain language comports with the Janeiro Declaration that states "'The Hartford' is not a legal entity. Rather, [it] is a brand name used by multiple, *distinct* entities, including Sentinel[.]" (¶ 9 (emphasis added).)

In sum, Plaintiffs have failed to show that HFSG is a party to the Policy. Absent any contractual relationship, *see Gruenberg*, 9 Cal. 3d at 576, or any specific allegations of any injuries fairly traceable to HFSG beyond those arising from the Policy, Plaintiffs have not met their burden of showing they have Article III standing to sue HFSG. Accordingly, all of Plaintiffs' claims against HFSG are also dismissed for lack of standing.

## CONCLUSION

For the reasons stated above, the Court GRANTS Sentinel's and HSFG's motions to dismiss. In light of the rapidly evolving legal landscape involving COVID-19 business interruption coverage, the dismissal is with leave to amend except for the unjust enrichment and

injunctive relief claims which are dismissed with prejudice as leave to amend would be futile. Plaintiffs' amended complaint, if they choose to amend, must be filed within 21 days of this Order.

This Order disposes of Dkt. Nos. 10 & 11.

**IT IS SO ORDERED.**

Dated: September 22, 2020

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

11